# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
February 3, 2015 Session Heard at Memphis[1]

## STATE OF TENNESSEE v. JONATHAN MITCHELL GRIMES

### Appeal from the Circuit Court for Gibson County
### No. H8987     Clayburn L. Peeples, Judge

_____

### No. W2014-00786-CCA-R3-CD  -  Filed June 26, 2015
_____

The defendant, Jonathan Mitchell Grimes, was indicted by the Gibson County Grand Jury in count 1 for rape of a child and in count 2 for aggravated sexual battery of a child under the age of thirteen.  At trial, the State dismissed count 2.  The jury subsequently convicted the defendant in count 1 of the lesser included offense of aggravated sexual battery, and he was sentenced to ten years at one hundred percent release eligibility.  On appeal, the defendant argues:  (1) the evidence is insufficient to sustain his conviction; (2) the trial court erred in allowing evidence of uncharged crimes, wrongs, or acts under Rule 403 and Rule 404(b) of the Tennessee Rules of Evidence; (3) the trial court erred in allowing the victim to testify after speaking with prosecutors during a break at trial; and (4) the State's bill of particulars did not provide adequate notice to him of the time frame for the charged offense, and there was a fatal variance between the bill of particulars and the evidence presented at trial.  Upon review, we affirm the judgment of conviction, vacate the judgment forms in counts 1 and 2, and remand the case for entry of correct judgment forms.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

JOHN EVERETT WILLIAMS J., delivered the opinion of the court, in which ROGER A. PAGE, J., joined. CAMILLE R. MCMULLEN, J., filed a separate opinion concurring in part and dissenting in part.

Beau E. Pemberton, Dresden, Tennessee, for the defendant, Jonathan Mitchell Grimes.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Garry G. Brown, District Attorney General; and Edward L. Hardister

---

[1] Oral Argument was heard in this case on February 3, 2015, at the Cecil C. Humphreys School of Law at the University of Memphis in Memphis, Tennessee, as a part of the S.C.A.L.E.S (Supreme Court Advancing Legal Education for Students) project.

and Jason Scott, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

**Trial.** This case concerns allegations by the victim that the defendant, her stepfather, molested her. The defendant was subsequently indicted for rape of a child and aggravated sexual battery.

The thirteen-year-old victim testified that when she was eight years old, she moved to Medina, Tennessee, where she lived with her mother, brother, and grandmother for approximately a year and a half. She remembered having her ninth birthday while they lived in Medina. The victim said that her mother and the defendant began dating some time during that time period and that the defendant moved in with her family shortly after her family moved to Medina.

The victim recalled an incident during the time period that they lived in Medina when the defendant was tickling her and her brother and the defendant touched her vagina on the outside of her underwear. She stated that she was wearing a skirt at the time of this incident. When this incident occurred, her mother was standing at the door, and her brother was being tickled as well. The victim did not immediately tell anyone about this incident. In addition, the victim said that each night the defendant would tuck her into bed, he would touch her "private spot." On one particular night, the defendant placed his hand under her clothes and penetrated her vagina with his finger. When this occurred, she rolled over, and the defendant stopped touching her. She said the defendant penetrated her vagina with his finger on only one occasion. The victim told her brother about these incidents of abuse, and when the defendant deployed to Iraq, she told her mother that the defendant had been touching her inappropriately. When the victim's mother confronted the defendant about the victim's accusations, the defendant denied any abuse. The victim said her mother never contacted the police about the defendant's abuse of her.

On a different occasion, the victim awoke to discover that she was on top of the defendant and that her pants had been pulled down. When she pulled her pants up, the defendant asked her what was wrong, and she told him she was scared of monsters and returned to her room. On a different occasion, the defendant told her that he wanted to tickle her naked, so he took her to the room she shared with brother, placed her on the top bunk, removed her clothing, and tickled her naked after blocking the door with his foot so that her brother could not get into the room. She explained that the defendant was able to tickle her on the bed and still have his foot blocking the door because the room was very small. During this incident, the victim screamed for her brother, told the defendant to

stop, and covered her body with the sheets as her brother tried to get in the room. The defendant finally stopped touching her and left the room. When her brother gained entry into the room, she told him what the defendant had done to her moments before. The victim said that after she told her brother about the defendant's abuse, her brother disclosed this abuse to a school counselor. The victim later told this counselor that she had been abused by the defendant.

The victim stated that when the defendant returned home from military deployment, they moved to a house in Milan, Tennessee, where the victim lived from age nine to age ten. She stated that there were other incidents involving the defendant that occurred after the family moved to Milan. On one occasion, when her mother was at work, the defendant tried to make her try on old clothing and told her that she had to disrobe completely. When she refused, he spanked her. She then told the defendant, "I'm going to get you back." She explained that this meant she was "going to tell on him." However, she acknowledged that by the time her family moved to Milan, she had already told her mother about the defendant's abuse of her in Medina, even though her mother "didn't do anything." On another occasion, when the victim was nine years old and her mother was at work, the defendant helped her get conditioner out of her hair and "stroked parts of [her] body." She said, "[the defendant] was just taking the sponge and was scrubbing me on my stomach and then he went down to my private part, of course, and he said you need to wash it." The victim said she told him to get away and was unsure whether she told her mother about that incident.

On still another occasion, when they were playing "cops and robbers," the defendant tied the victim's hands to the bedpost and pulled down her pants against her will and then walked away. The victim stated that the defendant did not touch her inappropriately during the incident. Her brother, who had been trying to get into the defendant's bedroom, was able to enter the room and free her. The victim also recalled an incident when the defendant bent over to help her with her homework and placed his elbow on her pants so that his elbow was in contact with her vagina. She said she pushed him away because she did not "want anything touching [her] there[.]" In addition, the victim recalled an incident, although she did not know her age at the time, when the defendant instructed her to masturbate in the shower, and she complied. The victim stated she watched movies containing sexual content with the defendant and her family. She denied watching these movies with the defendant alone.

The victim stated that she had never been molested by any adult other than the defendant. She acknowledged that although she threatened to get the defendant back when he spanked her, her brother was the one who disclosed the defendant's abuse of her to the school counselor. She explained that when she made that statement about getting the defendant back, she meant that she was going to tell someone about his abuse of her

with the hope that they could stop it.  The victim asserted that she had told the truth about what the defendant had done to her.  She denied confusing the defendant with someone else who had touched her inappropriately.

When the victim was asked if she remembered having hallucinations about bugs being on her in the hospital even though there were no bugs, she stated, "Really, I don't even know what was going on then."  She stated that her babysitter did not show her pornographic movies; instead, she remembered "picking [the disks] up and thinking it was a movie and putting them in."  She did not recall going to Pathways in 2006 for treatment for anxiety after the pornographic movies.  The victim remembered "going to the doctors about the bugs and . . . seeing the movies, but that's all."  She acknowledged that she did not inform the forensic interviewer or the district attorney about the incident in which the defendant tied her to a bed.  However, she asserted that she told the forensic interviewer she could not remember everything that happened and was going to tell her about the incidents she remembered.  The victim acknowledged telling the defendant on several occasions that she was going to get him back.  She said she began to dislike the defendant when he began disciplining her and her brother and spanking them.  She added, "I started not feeling comfortable with all that he'd been doing, touching me and hitting us and stuff, so I just started not liking him."

The victim's twelve-year old brother testified that he recalled an incident in Medina when the defendant and his sister were in a bedroom and he could not get in the bedroom.  He stated that the victim was yelling his name, and he could not get inside the room because the defendant had braced his foot on the door.  He said that when the defendant left the room, he ran inside, and the victim was okay.  The victim's brother also recalled an incident in Milan when the defendant and the victim were alone in a locked room.  He explained that that they were playing hide and seek.  The victim had gone into another room to hide, and he heard her start yelling.  Because he was unable to open the door, he hid, and when the defendant left the room, he went inside.  He said the victim "was tied up and her pants were down."  He said that although her pants were down, her panties were not down.  He stated that "[the victim's] eyes were tied with some kind of cloth and her arms were tied with a belt."  He also said "[h]er feet were tied with a belt."

Heather Gordon, a Child Protective Services Investigator with the Department of Children's Services in Gibson County, investigated the case involving the victim.  She contacted law enforcement, who did an initial interview of the victim.  Because the victim disclosed that she had been sexually abused in the initial interview, Gordon set up a forensic interview with the victim.

The defendant testified that he never sexually abused or inappropriately touched the victim in any way. He met the victim's mother in spring 2007, and they married in February 2008. The defendant said he was deployed to Iraq from the middle of May 2007 to February 2008, when he returned home for two weeks and married the victim's mother before returning to Iraq until June 2008.

During his deployment, the defendant called home, and the victim's mother, who by that time was his wife, informed him that the victim had accused him of "touching her inappropriately." He replied, "That's not possible. I've been in Iraq since right after Mother's Day." The defendant said that as he and the victim's mother asked the victim questions about her abuser, the victim disclosed that the person who touched her inappropriately drove a red car. The defendant said he had always driven a white truck. The victim's mother acknowledged that she had an ex-boyfriend who drove a red car, and by the end of the conversation, the defendant and the victim's mother believed that the ex-boyfriend was responsible for the victim's abuse. The defendant acknowledged that neither he nor the victim's mother ever contacted the police about pressing charges against the person they believed was responsible for molesting the victim.

The defendant stated that he returned from Iraq in June 2008 and moved into the family's trailer in Medina. He lived with the family in Medina from June 2008 to November 2008, when the defendant and the family moved into a house in Milan. At the end of 2008, Niva Abiles moved in with the family because she was having a difficult time financially.

The defendant said that when he began dating the victim's mother, he learned that the victim "had been shown pornographic images by her babysitter and had been treated at Pathways for anxiety because of the pornography." He also learned that the victim in 2006 "had a hallucinogenic episode where she was treated at the McKenzie Hospital and during this episode she had stripped all of her clothes off and was looking for bugs that were on her[,] and the nurse . . . state[d] in her report that there were no bugs [any]where."

The defendant stated that he could not recall the incident described by the victim that allegedly occurred in Medina when she awoke on top of him with her pants down. He stated, "I'm a heavy sleeper so I do not recall her ever being on top of me." The defendant said he would sometimes return home from work at 3:00 a.m. and find the victim in his and his wife's bed, and he would move the victim to her own bed. The defendant acknowledged that he bathed the victim, although he denied touching her inappropriately while doing so. He said he bathed her because he had gotten a phone call from his wife, the victim's mother, who told him that the victim had been smelling bad and that he needed to show her how to clean herself. He stated that the victim's mother

was unable to teach the victim how to bathe because she was at work. The defendant denied touching the victim inappropriately or sexually while he was teaching her how to bathe. He admitted that he showed the victim how to bathe after the victim accused him of molesting her.

The defendant acknowledged that he frequently played a tickling game with the victim and her brother in which he would grab them by their ankles, hold them up, and tickle their stomach or under their arms. Although he said the victim liked the game at first, she "would say her pants were falling down and she was uncomfortable and I would let her go." The defendant said, "[N]ormally that would end that play episode, 'cause . . . it's kind of hard to continue when you've already been accused [of touching her inappropriately] and you just don't want to even be close to it." He acknowledged that he might have accidentally touched the victim's vagina while he was tickling her, but he denied tickling her for "sexual gratification or arousal." He admitted that he continued to tickle the victim after the victim accused him of sexually abusing her.

The defendant asserted that he would not have been able to brace his foot against the door of the victim's bedroom in Medina if he was standing by her bed. He acknowledged that he disciplined the victim and her brother when he returned from his deployment in Iraq by yelling at them, grounding them, taking away their video games, and spanking them. He stated that it did not make him feel uncomfortable to discipline the victim after she had made allegations of sexual abuse against him. The defendant denied sexually abusing the victim while spanking her.

The defendant said that the victim did not like being disciplined. He recalled an incident when his friend Theodore Smith was at his house playing video games and he told the victim to clean up her clothes and toys, and the victim refused. When the victim became defiant, he spanked her on her bottom, and the victim told him, "I'll get you back for this. I'll get you back." The defendant said that approximately one week after the victim made this statement, he was arrested for abusing the victim. He said he believed the victim testified dishonestly about the abuse because she did not like him. He also asserted that the victim's brother testified falsely because he did not like him either. The defendant denied watching pornography with the victim. He also denied telling the victim to masturbate in the shower. He claimed that the victim's mother or the victim's grandmother usually tucked the children into bed. The defendant stated that although he recalled putting handcuffs on the victim and her brother while playing "cops and robbers," he denied molesting the victim during this game.

Theodore Smith, who had served in the military with the defendant, testified that he had been friends with the defendant for the last four years. Smith said he was present on one occasion when the defendant disciplined the victim by spanking her with an open

palm, and the victim told the defendant, "I'm going to get you back for that." He witnessed the defendant's arrest for abusing the victim approximately one week later.

Matthew Schwarz testified that he had known the defendant for seven years, had worked with him, and had shared an apartment and house with him. He opined that the defendant had been honest about his involvement with the victim.

Neva Abiles testified that she lived with the defendant, his wife, and his wife's children from December 2009 to March 2010, when the defendant was arrested. During this time period, she did not observe the defendant physically disciplining the victim, although she saw him take away games and send the victim to her room. Abiles stated that the victim did not react well to being disciplined.

## ANALYSIS

**I. Sufficiency of the Evidence.** The defendant argues that the evidence is insufficient to sustain his aggravated sexual battery conviction. He claims that the victim's testimony, without other proof, is insufficient to establish the elements of the offense beyond a reasonable doubt and that the evidence presented at trial failed to show that his conduct was for the purpose of sexual arousal or gratification. The defendant also claims the proof was insufficient because "[t]he record . . . does not indicate which incident or incidents of conduct the State relies on to support [his] conviction." Because the State properly identified its election offense and because the proof established the elements of aggravated sexual battery beyond a reasonable doubt, the defendant is not entitled to relief.

When considering the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt."

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Hanson*, 279

S.W.3d 265, 275 (Tenn. 2009). Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *Hanson*, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

Aggravated sexual battery is defined as "unlawful sexual contact with a victim by the defendant or the defendant by a victim [where] . . . [t]he victim is less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4) (2006). "'Sexual contact' includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" Id. § 39-13-501(6) (2006). "'Intimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" Id. 39-13-501(2) (2006). "The requirement of a particular purpose, to arouse or gratify sexual desire, distinguishes the crime of sexual battery from an ordinary assault and from non-criminal touching or contact." *State v. Santos Medardo Funes Romero*, No. E2013-02137-CCA-R3-CD, 2014 WL 7010815, at *16 (Tenn. Crim. App. Dec. 12, 2014) (citing *State v. Anthony Lee Hill*, No. E2003-02998-CCA-R3-CD, 2005 WL 623244, at *5 (Tenn. Crim. App. Mar. 17, 2005)). The aggravated sexual battery statute does not require that the defendant become sexually aroused or gratified by the sexual contact, only that the touching can be "'reasonably construed as being for the purpose of sexual arousal or gratification.'" *State v. Mahlon Johnson*, No. W2011-01786-CCA-R3-CD, 2013 WL 501779, at *12 (Tenn. Crim. App. Feb. 7, 2013) (quoting *State v. Roy Chisenhall*, No. M2003-00956-CCA-R3-CD, 2004 WL 12177118, at *3 (Tenn. Crim. App. June 3, 2004)).

First, the defendant argues that the victim's testimony, without other proof, is insufficient to establish the elements of the offense beyond a reasonable doubt. He asserts that there were no "medical records, law enforcement testimony, physical

evidence, or any other relevant evidence at trial to support [the] indictment or to corroborate the testimony presented through [the State's] witnesses." He also argues that the victim's brother and Heather Gordon, the Department of Children's Services investigator, failed to provide "any substantial proof" of the "required statutory elements" for aggravated sexual battery. Here, the victim testified about one incident in Medina, Tennessee, when the defendant digitally penetrated her vagina, and she rolled over, which caused the defendant to stop. Initially, we note that the testimony of a victim, alone, is sufficient to sustain a conviction for aggravated sexual battery. *See State v. Smith*, 42 S.W.3d 101, 106 (Tenn. Crim. App. 2000); *State v. Russell Victor McCollum*, No. M2012-00941-CCA-R3-CD, 2014 WL 1102012, at *6 (Tenn. Crim. App. Mar. 20, 2014). Moreover, we conclude that the victim's brother's and Gordon's testimony, as we will explain below, provided circumstantial evidence corroborating the victim's testimony regarding the charged offense.

Second, the defendant argues that the evidence presented at trial did not show that his conduct was for the purpose of sexual arousal or gratification. It is well recognized that a jury may infer intent from circumstantial evidence. *See Hall v. State*, 490 S.W.2d 495, 496 (Tenn. 1973); *see also State v. Hayes*, 899 S.W.2d 175, 180 (Tenn. Crim. App. 1995) ("[I]ntent is almost always proven circumstantially."). Moreover, "jurors may use their common knowledge and experience in making reasonable inferences from evidence." *State v. Meeks*, 876 S.W.2d 121, 131 (Tenn. Crim. App. 1993) (citing 23A C.J.S. Criminal Law § 1380). Viewing the evidence in the light most favorable to the State, we conclude that the proof is sufficient for a rational jury to find that the defendant's touching of the victim's intimate parts was intentional and could be "reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6). The evidence presented at trial showed that the defendant digitally penetrated the victim's vagina on one occasion in Medina, Tennessee, when the victim was either eight or nine years old. The victim later informed her mother and brother of the defendant's abuse of her. Although the victim's mother confronted the defendant regarding these allegations, she failed to take any further action. At some later point, the victim's brother told a school counselor that the defendant had sexually abused his sister and the victim disclosed this abuse to the same counselor. Shortly thereafter, the victim told law enforcement and a forensic interviewer about the defendant's abuse of her. We conclude that this proof supports the jury's determination that the defendant's touching of the victim constituted "sexual contact" for the purpose of the aggravated sexual battery statute and was sufficient to sustain the defendant's conviction.

Finally, the defendant argues that the evidence is insufficient to sustain his conviction because "[t]he record . . . does not indicate which incident or incidents of conduct the State relies on to support [his] conviction." Although the State disclosed that the charged conduct occurred in Medina, Tennessee, between December 2006 and

November 2008, the defendant claims that none of the State's witnesses gave a time frame, including the month, week, holiday, etc., that the charged act against the victim occurred. He also claims that the victim testified about incidents that occurred after the family moved to Milan and that "the State lumped all of its proof pertaining to sexual contact between the victim and [him] into one general argument and sought a conviction on these facts without defining which facts the State was relying upon to secure a conviction[.]" Lastly, the defendant asserts that the victim's testimony as to the time period of the indicted offense is not credible because she testified that the defendant moved in with them shortly after they moved to Medina in 2007 while the other evidence showed that the defendant did not start living with the victim's family in Medina until 2008. He contends that this disparity in proof is "particularly troublesome" given that the State alleged the conduct charged in the indictment occurred "in 2007, long before [the defendant] came to live with the victim."

"'[W]hen the evidence indicates [that] the defendant has committed multiple offenses against a victim, the prosecution must elect the particular offense as charged in the indictment for which the conviction is sought.'" *State v. Johnson*, 53 S.W.3d 628, 635-36 (Tenn. 2001) (quoting *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999)). The doctrine of election allows the defendant to prepare for a specific charge, protects the defendant against double jeopardy, ensures that a trial court is able to review the weight of the evidence in its role as a thirteenth juror, and allows an appellate court to review the legal sufficiency of the evidence. *Brown*, 992 S.W.2d at 391 (citing *Tidwell v. State*, 922 S.W.2d 497, 500-01 (Tenn. 1996); *Burlison v. State*, 501 S.W.2d 801, 803 (Tenn. 1973)). Election also ensures juror unanimity by requiring the jurors to deliberate over and render a verdict on the same offense. *Johnson*, 53 S.W.3d at 631 (citing *Brown*, 992 S.W.2d at 391).

The Tennessee Supreme Court has rejected a general sex crimes exception to Rule 404(b), which allowed evidence of other sex crimes to be admissible if they were for the purposes of "corroboration, or to show the intimate relations between the parties, or to show that the defendant had a lustful disposition." *See State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994) (citations omitted); *State v. Burchfield*, 664 S.W.2d 284, 287 (Tenn. 1984). In rejecting the general sex crimes exception, the court recognized that such evidence "easily results in a jury improperly convicting a defendant for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial." *Rickman*, 876 S.W.2d at 828 (citing *Anderson v. State*, 56 S.W.2d 731, 731-32 (Tenn. 1933)). Instead, the court recognized a narrow, special rule allowing for the admissibility of other sexual crimes "when an indictment is not time specific and when the evidence relates to sex crimes that allegedly occurred during the time as charged in the indictment." *Id.* at 829; *see State v. Shelton*, 851 S.W.2d 134, 136-37 (Tenn. 1993); *State v. Brown*, 762 S.W.2d 135, 137

(Tenn. 1988); *but see State v. Woodcock*, 922 S.W.2d 904, 911 (Tenn. Crim. App. 1995) (stating that "*Rickman* leaves no doubt that evidence of a defendant's sexual misconduct not charged in the indictment and not connected to any of the charges in the indictment is inadmissible during the State's case-in-chief under Tennessee Rule of Evidence 404(b)"); *State v. Danny Ray Smith*, No. E2012-02587-CCA-R3-CD, 2014 WL 3940134, at *13 (Tenn. Crim. App. Aug. 13, 2014) (concluding that the trial court erred in admitting evidence of other sexual acts pursuant to the *Rickman* rule when the State knew it was going to elect the digital penetration incident as the event for which it was seeking conviction and when this anticipated election was based on both the victim's testimony, the defendant's confession to digitally penetrating the victim, and the inculpatory tracing on the defendant's hand regarding the extent of the penetration); *State v. Jeff Carter*, No. M2009-02399-CCA-R3-CD, 2010 WL 5343212, at *9-11 (Tenn. Crim. App. Dec. 16, 2010) (holding that the trial court improperly applied the narrow *Rickman* rule when there was one indicted offense, when the State provided a detailed bill of particulars identifying a single incident, and when the State repeatedly asserted during a motion hearing that it was going to elect this single incident at the close of its proof).

The rule established in *Rickman* protects a defendant's right to a unanimous jury verdict and allows "the State some latitude in the prosecution of criminal acts committed against young children who are frequently unable to identify a specific date on which a particular offense was committed." *Rickman*, 876 S.W.2d at 828 (citing *Shelton*, 851 S.W.2d at 137). "Unlike evidence of prior crimes excluded by *Bunch [v. State*, 605 S.W.2d 227, 230 (Tenn. 1980),]* and Tenn. R. Evid. 404(a) & (b), evidence of a prior sex crime that is necessarily included within the charge of the indictment is also necessarily relevant to the issues being tried and, therefore, is admissible." *Id.* at 829 (citing Tenn. R. Evid. 402). When utilizing the narrow rule in *Rickman*, "the State must elect at the close of its proof-in-chief as to the particular incident for which a conviction is being sought." *Id.* However, this court has concluded that the State may effectively elect offenses as late as its closing arguments after presenting evidence of other sexual crimes pursuant to *Rickman*. *See State v. Warren Curnutt*, No. M2006-00552-CCA-R3-CD, 2007 WL 1482390, at *6 (Tenn. Crim. App. May 22, 2007); *State v. James Arthur Kimbrell*, No. M2000-02925-CCA-R3-CD, 2003 WL1877094, at *23 (Tenn. Crim. App. Apr. 15, 2003).

In this case, the indictment alleged that the defendant "upon or after December 1, 2006, in Gibson County, Tennessee, and before the finding of this indictment, did unlawfully and knowingly sexually penetrate [the victim], a person less than thirteen (13) years of age and more than three (3) years of age, in violation of T.C.A. § 39-13-522 . . . ." The bill of particulars stated that the defendant lived with the victim in Medina, Tennessee, "from December of 2006 until November of 2008" and that during that time period, the defendant "did digitally penetrate the victim's vagina on at least on[e] occasion" and "did fondle the victim on multiple occasions on her vagina and buttocks."

- 11 -

At trial, following the close of all proof in this case, the State identified its election offense as "the one incident where the victim . . . described [the defendant] tucking her into bed and reaching underneath her panties and inserting a portion of his finger in her vagina." Although the defendant claims that the State failed to identify the conduct relied upon in the indictment, the record shows that the State made a proper election in this case. While the victim testified that the defendant inappropriately touched her "private spot" numerous times while tucking her into bed, the victim only testified about one incident in which the defendant digitally penetrated her vagina, which caused her to roll over until he stopped.

As to the defendant's claim that none of the State's witnesses gave a time frame, including the month, week, holiday, etc., that the indicted offense occurred, we recognize that the State is not required to provide a defendant with the specific date that the indicted offense occurred. The Tennessee Supreme Court, noting the difficulties in applying the election requirement in child sex abuse cases, held that "a particular offense can often be identified without a date." *Shelton*, 851 S.W.2d at 137. This rule is reiterated in Tennessee Code Annotated section 40-13-207, which provides:

> The time at which the offense was committed need not be stated in the indictment, but the offense may be alleged to have been committed on any day before the finding of the indictment, or generally before the finding of the indictment, unless the time is a material ingredient in the offense.

T.C.A. § 40-13-207; *see State v. Byrd*, 820 S.W.2d 739, 740 (Tenn. 1991) ("[T]he exact date, or even the year, of an offense need not be stated in an indictment or presentment unless the date or time 'is a material ingredient in the offense.'" (quoting T.C.A. § 40-13-207)); *State v. Sowder*, 826 S.W.2d 924, 928 (Tenn. Crim. App. 1991) ("The indictment need not be specific regarding the time or place of the offense[.]"). In *Shelton*, the court outlined the various ways in which the State may identify the indicted offense for the jury:

> If, for example, the evidence indicates various types of abuse, the prosecution may identify a particular type of abuse and elect that offense. *See e.g.*, *State v. Fears*, 659 S.W.2d 370, 374 (Tenn. Crim. App. 1983). Moreover, when recalling an assault, a child may be able to describe unique surroundings or circumstances that help to identify an incident. The child may be able to identify an assault with reference to a meaningful event in his or her life, such as the beginning of school, a birthday, or a relative's visit. Any description that will identify the prosecuted offense for the jury is sufficient. In fulfilling its obligation under *Burlison* to ensure that an election occurs, the trial court should bear in mind that the purpose of

election is to ensure that each juror is considering the same occurrence. If
the prosecution cannot identify an event for which to ask a conviction, then
the court cannot be assured of a unanimous decision.

*Shelton*, 851 S.W.2d at 138 (internal footnote omitted). Other than proving the victim's age at the time of the offense, time is not a material ingredient in aggravated sexual battery, which was the defendant's conviction offense. *See Jeff Carter*, 2010 WL 5343212, at *17. We conclude that the State properly identified the charged offense by limiting the time period for the offense in the bill of particulars and by making an election as to a specific incident at trial. The record shows the jury was required to consider the State's elected offense, which was the single incident involving digital penetration of the victim's vagina, and not the other offenses testified to by the victim.

Although the defendant claims the victim's testimony as to the time period of the charged offense is not credible, we reiterate that it was the jury's prerogative, as the trier of fact, to evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *See Campbell*, 245 S.W.3d at 335 (citing *Byrge*, 575 S.W.2d at 295). Moreover, this court does not substitute its inferences for those drawn by the trier of fact. *See Dorantes*, 331 S.W.3d at 379. The jury in this case accredited the victim's testimony over the defendant's testimony and resolved all inconsistencies of the evidence in favor of the State's theory before finding the defendant guilty of the lesser included offense of aggravated sexual battery in this case. Viewing the evidence in the light most favorable to the State, we conclude the proof was sufficient to sustain the defendant's conviction. Because the State properly identified the charged offense and because the evidence is sufficient to sustain the conviction, the defendant is not entitled to relief on this issue.

**II. <u>Admission of Evidence of Other Crimes, Wrongs, or Acts.</u>** The defendant argues that the trial court erred in permitting the victim to testify to events that occurred beyond the trial court's jurisdiction and for permitting the State to cross-examine the defendant about said events. Specifically, he contends that the evidence was unfairly prejudicial pursuant to Tennessee Rules of Evidence 403 and 404(b) and that the prejudice outweighed the probative value.

Tennessee Rule of Evidence 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." However, such evidence may be admissible for other purposes, such as illustrating motive, intent, guilty knowledge, the identity of the defendant, absence of mistake or accident, and common scheme or plan.

*Collard v. State*, 526 S.W.2d 112, 114 (Tenn. 1975); Tenn. R. Evid. 404(b) Advisory Comm'n Cmt. In order to admit evidence of a prior bad act:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). Our standard of review of the trial court's determinations under Tennessee Rule of Evidence 404(b) is whether the trial court's ruling was an abuse of discretion. *State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997). However, this decision is entitled to deference only if the trial court substantially complied with the procedural requirements of Rule 404(b). *Id.*

At trial, the victim began to testify about several incidents that occurred in Milan, Tennessee. Trial counsel objected "to things that are outside this Court's jurisdiction." A bench conference was held, and the State argued that the incidents were relevant to show motive. Trial counsel did not argue that the evidence was inadmissible under 404(b) or ask the court to hold a hearing to determine the admissibility of the testimony. The trial court found that the evidence was relevant, and trial counsel did not further object.

Initially, the majority notes that a party on appeal is bound to the ground of the objection that it asserted at trial. *See State v. Schiefelbein*, 230 S.W.3d 88, 129 (Tenn. Crim. App. 2007) (citing *State v. Adkission*, 899 S.W.2d 626, 634-35 (Tenn. Crim. App. 1994); Tenn. R. Evid. 103(a)(1)); *see also* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Although the defendant initially objected to evidence of acts, crimes, or wrongs in Milan, he objected on the ground that this evidence was outside the trial court's jurisdiction. Consequently, the defendant has waived any issue regarding the

admission of this evidence pursuant to Rule 404(b) because he did not object to this evidence on this ground at trial.

Because the defendant has waived this issue, we may only review it for plain error.[2]  This court has held that "rarely will plain error review extend to an evidentiary issue." *State v. Ricky E. Scoville*, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sept. 11, 2007).  In order to obtain plain error review, the defendant must show that:

> (a) the record clearly establishes what occurred in the trial court; (b) a clear and unequivocal rule of law was breached; (c) a substantial right of the accused was adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *Adkisson*, 899 S.W.2d at 641-42).  "It is the accused's burden to persuade an appellate court that the trial court committed plain error." *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007) (citing *United States v. Olano*, 507 U.S. 725, 734 (1993).  "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Smith*, 24 S.W.3d at 283.

The majority concludes that the defendant has not established that plain error review is warranted.  First, while the record clearly establishes what occurred in the trial court regarding the objection to the Milan incidents, the record is incomplete in regards to a 404(b) objection.  Because trial counsel did not object under 404(b) or request a jury-out hearing, the trial court was unable to determine whether a material issue other than conduct conforming with a character trait existed or whether the probative value of the evidence was outweighed by the danger of unfair prejudice.  Second, it is not apparent that the trial court breached a "clear and unequivocal rule of law" by failing to follow the procedures of 404(b).  The rule states that the trial court must hold a jury-out hearing

---

[2] The majority notes that in his brief, the defendant did not raise the issue of plain error.  Instead, he argued only that the evidence was inadmissible pursuant to Tennessee Rules of Evidence 403 and 404(b).

upon request. Tenn. R. Evid. 404(b)(1). While a trial court may sua sponte conduct a hearing, the language of the rule indicates that "the trial court was not obligated to conduct such a hearing absent a request." *State v. Hall*, 958 S.W.2d 679, 707 (Tenn. 1997) (app'x); *see also State v. Jones*, 151 S.W.3d 494, 498 n.3 (Tenn. 2004) (declining to consider whether evidence should have been excluded pursuant to 404(b) when the defendant failed to request a 404(b) hearing). As the defendant did not request a 404(b) hearing, the trial court was not obligated to conduct one. Because the defendant has failed to show that the first two plain error factors are satisfied, we need not consider the remaining factors. The defendant is not entitled to any relief.

**III. <u>State's Discussion with Victim During a Break in her Testimony.</u>** The defendant argues that the trial court erred in allowing the victim to testify after talking with the prosecutors during a break at trial. He asserts that the "victim's testimony at trial may have been . . . discussed in the presence of the jury" and that "the victim's testimony may have been unfairly coached or influenced [by the prosecutors] during the lunch break on the day of trial[.]" The defendant contends that "[t]his type of undue influence on a material witness, coupled with the witness's own uncertain answer on whether it actually happened" prejudiced him because the victim was the State's primary witness. Moreover, he asserts that the trial court should have instructed the jury to either disregard anything it may have heard during the beginning of the lunch break or should have prevented the victim from testifying further if the court believed the victim had discussed her testimony outside the trial and in the presence of the jury. We conclude that the defendant has waived this issue for failing to make a contemporaneous objection and that he is not entitled to plain error review.

During trial, defense counsel asked the victim if there had been times in her life when she had "made up things that didn't really exist." During the ensuing bench conference, defense counsel stated that he intended to ask the victim about the times when she had hallucinations about bugs being on her body. At the jury-out hearing on this issue, the State said the defense had records showing that the victim received treatments for these hallucinations approximately a year and a half before the time period covered by the indictment. However, the State asserted that the victim's hallucinations were not a "made up story" because "if you're having a hallucination you're believing what you're saying and you're telling the truth." The court replied: "[Defense counsel] is saying that she was having hallucinations about something happening to her body that wasn't happening. If, in fact, she was doing that within two years of this incident[.] I think it's relevant in a case in which the Defendant says this didn't happen." During this hearing, defense counsel said he was also going to ask the victim about an incident when her mother left her with a babysitter who showed her pornographic movies, and her

mother had to take the victim to a mental health center to receive counseling for anxiety stemming from the pornography two weeks before the hallucination event. He argued that this evidence was relevant because it could explain how the victim had knowledge of sexual matters prior to knowing the defendant, and the court agreed this evidence was relevant. Because it was nearing noon, counsel for both sides agreed it was appropriate to take a break for lunch, despite the fact that it was in the middle of the defense's cross-examination of the victim.

After the jury retired from the courtroom for lunch, the trial court asked, "What's going on? What is happening?" The record shows the court believed there was some sort of a problem and asked to speak to counsel for each party during a jury-out hearing. Upon being summoned, defense counsel stated, "I would assume they've just gotten into preparing the witness." The trial court replied, "Well, that's one of my fears." Defense counsel added, "They have the break now and they know what the questions are that they wouldn't have had otherwise." The trial court asked the State if there was a problem and noted that "everybody [was] gathered around this little girl and she's still testifying." When the court asked if the State was talking to the victim about her testimony, defense counsel requested that the State disclose the substance of its conversation with the victim. The State explained that it had asked the victim what she remembered about the bug hallucinations, and the victim "indicated that she felt that bugs were crawling [on her and that] she recalled being addressed . . . by someone about the movies she'd watched." Defense counsel stated, "[I]f that's the substance of their conversation and that's her testimony then I have no problem with anything."

When the jury returned to the courtroom following the lunch break, defense counsel continued its cross-examination of the victim. When counsel asked if anyone had talked to her during lunch "about the case or [her] testimony," the victim replied, "Kind of and kind of not. No, not really." Defense counsel then asked if anyone had told her what to say, and she said, "No." When defense counsel asked if anyone had given her any suggestions about what to say, she responded, "Like, to tell you the truth. There really were bugs in the house and I was afraid of bugs and I still am." When he asked if the State told her how she needed to answer his questions about the bugs, she stated, "They just told me that there really were bugs in the house." Then she said, "'Cause I knew that I wouldn't imagine bugs for no reason." When the victim was asked if she remembered complaining that bugs were on her in the hospital even though there were no bugs, she stated, "Really, I don't even know what was going on then." Defense counsel then asked the victim if she had a babysitter who showed her pornographic movies, and the victim said, "I don't remember her ever showing them. I just remember picking them up and thinking it was a movie and putting them in." The victim did not recall going to Pathways in 2006 for anxiety after watching the pornographic movies. She remembered "going to the doctors about the bugs and . . . seeing the movies, but that's all." At the end

of her re-direct examination, the victim acknowledged meeting with the prosecutors to talk about the case but asserted that the only thing the prosecutors wanted her to do was tell the truth.

We note that the defendant failed to make a contemporaneous objection to this issue at trial. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). The record shows that the defense never objected to the victim continuing to testify after meeting with the prosecutors. Instead, after the State disclosed the substance of the conversation, defense counsel asserted that if the content of the conversation was just as the prosecutor had claimed, then he had "no problem with anything." The record also shows that the defense never asked for the trial court to take any curative action. Because the record shows that the defendant did not make a contemporaneous objection or request any relief from the court, the issue is waived on appeal unless it constitutes plain error.

We also agree with the State that this issue does not rise to the level of plain error. *See* Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."); *Adkisson*, 899 S.W.2d at 641-42 (establishing the five factors that should be considered by this court when determining whether an error is "plain error.").

The record is devoid of any evidence that the victim's testimony was discussed in the presence of the jury, so our consideration is limited to whether the prosecutors unduly influenced the victim's testimony by talking to her during the break in trial. Prosecutorial misconduct does not constitute reversible error absent a showing that it has affected the outcome of the trial to the prejudice of the defendant. *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001) (citing *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001)). In determining whether the prosecutor's conduct could have affected the verdict to the prejudice of the defendant, this court should consider the following factors:

> 1) the conduct complained of, viewed in light of the facts and circumstances of the case; 2) the curative measures undertaken by the court and the prosecution; 3) the intent of the prosecutor in making the improper arguments [or in pursuing the improper conduct]; 4) the cumulative effect of the improper conduct and any other errors in the record; and 5) the relative strength and weakness of the case.

*Berry*, 141 S.W.3d at 586 (citing *State v. Middlebrooks*, 995 S.W.2d 550, 560 (Tenn. 1999)). There is nothing in the record that indicates any misconduct on the part of the prosecutors in this case. The victim testified at trial that the testimony she was providing to the jury was her own testimony. The defense never requested that the court strike the victim's testimony and never objected to the victim continued testimony. The record shows that the prosecutors did not tell the victim what to say; instead, the prosecutors told the victim to tell the truth. *See State v. Gary Lee Miller*, No. M1998-00788-CCA-R3-CD, 2000 WL 246452, at *10 (Tenn. Crim. App. Mar. 6, 2000). In addition, the defense, during its extensive and thorough cross-examination of the victim, was allowed to delve into whether the prosecutors influenced the victim's testimony. As we previously noted, the defense never asked for any curative action from the court. *Id.*

We conclude that the defendant has failed to show how this alleged misconduct by the State affected the outcome of his trial. Because the defendant has failed to show that a substantial right afforded to him was adversely affected or that consideration of any error is necessary to do substantial justice, we conclude that the defendant is not entitled to plain error relief.

**IV.** **Notice Given by State's Bill of Particulars.** The defendant asserts that he was unable to adequately prepare for trial because the State's bill of particulars "lacked specificity and substance," particularly on the issue of the time frame for the charged offense. He also claims that the evidence presented at trial deviated from the information included in the bill of particulars regarding the charged offense. We conclude that the bill of particulars properly identified the charged offense in this case and that any variance between the proof and the indictment and bill of particulars was neither material nor prejudicial.

First, the defendant asserts, without explanation, that the State could have narrowed the beginning time frame for the charged conduct in Medina from December 2006 to May 2007, which effectively reduced the time frame for the charged offense by nearly twenty percent. He states that if he had known of this narrower time frame prior to trial, he could have used this information to better prepare his defense.

Tennessee Rule of Criminal Procedure 7(c) provides: "On defendant's motion, the court may direct the district attorney general to file a bill of particulars so as to adequately identify the offense charged." The purpose of a bill of particulars is to provide the defendant with enough information to prepare his defense, to avoid prejudicial surprise at trial, and to preserve a claim of double jeopardy. *Byrd*, 820 S.W.2d at 741 (citing *State v. Hicks*, 666 S.W.2d 54, 56 (Tenn. 1984)). "A bill of particulars is not a discovery device and is limited to information a defendant needs to prepare a defense to the charges." *State v. Sherman*, 266 S.W.3d 395, 409 (Tenn. 2008) (citing

Tenn. R. Crim. P. 7(c), Advisory Comm'n Cmts). "Although a court should make every effort to see that the prosecution supplies critical information in the bill of particulars, . . . in cases involving child sexual abuse, the prosecution may be unable to supply specific dates on which alleged offenses occurred." *State v. Speck*, 944 S.W.2d 598, 600 (Tenn. 1997). A conviction will be affirmed "if in the course of the trial it does not appear that the defendant's defense has been hampered by the lack of specificity." *Byrd*, 820 S.W.2d at 742). However, "a conviction must be reversed if trial testimony establishes that the [S]tate had in its possession, either actually or constructively, additional information that could have helped pinpoint the nature, time, or place of the offense, and withheld that information from the defendant." *Id.* A "lack of specificity [in a bill of particulars] will not result in reversible error unless a defendant can prove prejudice." *Sherman*, 266 S.W.3d at 409 (citing *Speck*, 944 S.W.2d at 601; *Byrd*, 820 S.W.2d at 741).

We conclude that the bill of particulars sufficiently identified the charged offense in this case. The indictment stated that "upon or after December 1, 2006, in Gibson County, Tennessee, and before the finding of this indictment, did unlawfully and knowingly sexually penetrate [the victim], a person less than thirteen (13) years of age and more than three (3) years of age, in violation of T.C.A. § 39-13-522 . . . ." The bill of particulars further limited the time period by stating that the defendant lived with the victim in Medina, Tennessee, "from December of 2006 until November of 2008[.]" The bill of particulars also limited the type of criminal conduct that occurred during that time period because it stated that the defendant "did digitally penetrate the victim's vagina on at least on[e] occasion" and "did fondle the victim on multiple occasions on her vagina and buttocks." At trial, following the close of all proof in this case, the State identified its election offense as "the one incident where the victim . . . described [the defendant] tucking her into bed and reaching underneath her panties and inserting a portion of his finger into her vagina." At trial, the victim was unable to pinpoint the exact date that the defendant moved in with her family to their home in Medina and testified that the defendant digitally penetrated her some time during the approximately year and a half that her family lived in Medina. There is no evidence that the State possessed, either actually or constructively, additional information that could have helped pinpoint the time of the offense, and withheld that information from the defendant. Moreover, as we will explain, the defendant is unable to prove that he was prejudiced by any lack of specificity in the bill of particulars.

The defendant also claims that the evidence presented at trial deviated from the information included in the bill of particulars regarding the charged offense. We note that "'[a] variance between an indictment or a subsequent bill of particulars and the evidence presented at trial is not fatal unless it is both material and prejudicial." *State v. Shropshire*, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000) (citing *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984); *State v. Ealey*, 959 S.W.2d 605, 609 (Tenn. Crim. App. 1997)).

"A material variance occurs only if the prosecutor has attempted to rely upon theories and evidence at the trial that were not fairly embraced in the allegations made in the charging instrument." *Id.* (citing *State v. Mayes*, 854 S.W.2d 638, 640 (Tenn. 1993); *Ealey*, 959 S.W.2d at 609); *see Moss*, 662 S.W.2d at 592. Prejudice is demonstrated if a defendant can show that the indictment did not sufficiently inform him of the charges against him so that he could adequately prepare his defense without being misled or surprised at trial or if there is a danger that he may be prosecuted a second time for the same offense. *Mayes*, 854 S.W.2d at 640 (citing *Moss*, 662 S.W.2d at 592). "[T]he trial court cannot determine whether or not the defendant has been hampered in his defense until the court knows what proof the state will offer as to time and place of the offense, and how this evidence relates to the actual theory of defense." *Byrd*, 820 S.W.2d at 741.

After reviewing the record, we conclude that any variance between the proof and the indictment and bill of particulars was neither material nor prejudicial. The victim's testimony at trial was consistent with the bill of particulars. Although the victim was unable to pinpoint the exact date that the defendant moved in with her family to their home in Medina, she testified that the defendant digitally penetrated her some time during the approximately year and a half that her family lived in Medina. The defendant extensively cross-examined the victim at trial. He testified that he did not meet the victim's mother until spring 2007 and presented evidence of the date he moved in with the victim's family and of the lengthy periods of his military deployment, which precluded his access to the victim. *See State v. Everett Russ*, No. W2012-00461-CCA-R3-CD, 2013 WL 6500152, at *3 (Tenn. Crim. App. Dec. 9, 2013) (holding that the defendant was not deprived of his ability to prepare for trial when the defendant knew the weekends that the victim visited his house during the dates provided in the bill of particulars), *perm. app. granted, case remanded* (Tenn. May 15, 2014), *opinion on remand*, 2014 WL 3511051 (Tenn. Crim. App. July 14, 2014). Consequently, any variance between the bill of particulars and the evidence presented at trial, if such a variance existed, was neither material nor prejudicial. The defendant was given a time period for the offense as well as detailed information regarding the location and nature of the offense, which allowed him to adequately prepare a defense.

We also agree with the State that the defendant is unable to show that he was prejudiced by the time period stated in the indictment and bill of particulars because his defense at trial was that he never touched the victim for the purpose of sexual gratification and that any touching of the victim's intimate parts, if it occurred, was accidental. Because the defendant does not state that a more specific time period in the indictment or bill or particulars would have changed his defense to his charge, he is not entitled to relief.

Although we affirm the conviction in this case, we note some significant errors in

the judgments forms. Specifically, the judgment forms erroneously show that count 1, which charged the defendant with rape of a child, was dismissed instead of count 2, which charged him with aggravated sexual battery. Based on the record, the judgment forms should have shown that the defendant was convicted in count 1 of the lesser included offense of aggravated sexual battery and that count 2 was dismissed. Although a corrected judgment form in count 2 was later entered, it was entered for the purpose of giving the defendant additional pretrial jail credit and did not correct any of the aforementioned errors. In light of these errors, we vacate the judgments forms in counts 1 and 2.

## CONCLUSION

In accordance with the foregoing authorities and reasoning, we affirm the judgment of conviction, vacate the judgment forms in counts 1 and 2, and remand the case for the entry of corrected judgments.

_____
JOHN EVERETT WILLIAMS, JUDGE